JS-6

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No.: | 8:21-cv-00808-SB-DFMx | Date: | September 29, 2021 |

| | |
|---|---|
| Title: | ***Shayna Lathus v. City of Huntington Beach and Does 1-20, inclusive*** |

| | |
|---|---|
| Present: The Honorable | **STANLEY BLUMENFELD, JR., U.S. District Judge** |

| Victor Cruz | N/A |
|---|---|
| Deputy Clerk | Court Reporter |

Attorney(s) Present for Plaintiff(s):          Attorney(s) Present for Defendant(s):

**Proceedings:     ORDER GRANTING DEFENDANT'S MOTION TO DISMISS [DKT. NO. 12]**

Plaintiff Shayna Lathus was appointed to the Citizen Participation Advisory Board of the City of Huntington Beach (CPAB) by former City Councilwoman Kim Carr, who is now the mayor of Huntington Beach. Dkt. No. 1 (Compl.) ¶ 10-11.  Plaintiff was photographed standing near what appeared to be members of 'Antifa' while attending a rally. *Id.* ¶ 13-14.  Carr instructed Plaintiff to denounce Antifa on social media. *Id.* ¶ 14.  Finding Plaintiff's denunciation insufficient, Carr dismissed Plaintiff from the CPAB, citing a lack of shared values. *Id.* ¶¶ 16, 18.  Plaintiff then sued Defendant City of Huntington Beach under 42 U.S.C. § 1983, alleging Carr violated the First Amendment by compelling her to post on social media and retaliating against her for attending the rally. *Id.* ¶ 22, 29.  Defendant has moved to dismiss Plaintiff's claims for failure to state a claim. Dkt. No. 12 (Mot.); *see also* Dkt. Nos. 16 (Opp.), 17 (Reply).  For the reasons discussed below, the Court **GRANTS** Defendant's motion.

1

I.

Plaintiff is a resident of Huntington Beach.  Compl. ¶ 9.  Plaintiff and Carr ran for City Council in 2018.  *Id.*  Carr won a seat; Plaintiff did not.  *Id.*  Soon after the election, Carr appointed Plaintiff as a member of the CPAB.  *Id.* ¶ 11.  Carr "had final policymaking authority on the decision to hire and fire" Plaintiff.  *Id.* ¶ 21.  Plaintiff accepted the appointment to "participate in local government [] and gain experience and name recognition locally as a springboard to further a career in politics and within Huntington Beach . . . ."  *Id.*

The CPAB is a part of city government.  Compl. ¶ 21.  It consists of seven members, each of whom is appointed by one city council member.  *See* Huntington Beach Municipal Code (H.B.M.C.) § 2.97.020.[1]  The members of the CPAB have "differing political views [and] affiliations."  *Id.* ¶ 12.  The CPAB's stated purpose is:

> [T]o provide citizen participation and coordination in the City's planning processes for the Community Development Block Grant Program administered by the Federal Department of Housing and Urban Development (HUD).  The board shall assess the needs of the community, particularly that of low and moderate income households, evaluate and prioritize projects pertaining to the required plans and provide recommendations to City Council on such plans and projects.  The board may hold public hearings to obtain citizen input on community needs, plans or proposals.  The board shall provide specific recommendations regarding the projects reviewed by the board to the City Council.

H.B.M.C. § 2.97.030.

On April 27, 2019, Plaintiff attended a rally in support of immigrant rights.  Compl. ¶ 13.  After the rally, Carr called Plaintiff to inform her that Carr had seen a photograph of Plaintiff at the rally "standing near individuals dressed in black that Carr identified as 'Antifa' members."  *Id.* ¶ 14.  Carr "instructed" Plaintiff to denounce Antifa.  *Id.* ¶ 15.  According to Plaintiff, she "reasonably understood" that her position on the CPAB depended upon her doing so.  *Id.*  Plaintiff then wrote a social media post stating that "she supports law enforcement officers, she

---

[1] Defendant filed an unopposed request for judicial notice of Chapter 2.97 of the Huntington Beach Municipal Code.  Dkt. No. 13.  The request is granted.  *See Tollis, Inc. v. Cty. of San Diego*, 505 F.3d 935, 938 n.1 (9th Cir. 2007) ("Municipal ordinances are proper subjects for judicial notice").

also supports immigrants' rights, she was not aware that people identifying as Antifa would be present at the rally, and she did not engage with people identified as Antifa." *Id.* ¶ 15.

Carr told Plaintiff that her social media post was "not enough" because Plaintiff did not "denounce" Antifa. *Id.* ¶ 16. Carr asked Plaintiff to resign from the CPAB, which Plaintiff did not want to do. *Id.* The next day, Plaintiff discovered through a social media post that Carr had "removed" her from the CPAB. *Id.* ¶ 17. Separately, Carr wrote a social media post stating that "[t]hose that do not immediately denounce hateful, violent groups do not share my values and will not be a part of my team." *Id.* ¶ 18.

Plaintiff then sued Defendant City of Huntington Beach under 42 U.S.C. § 1983, alleging Carr violated the First Amendment by both (i) "forcing [Plaintiff] to make a public statement about her attendance at the April 27 Rally under threat of losing her position on the . . . CPAB" and (ii) "firing [Plaintiff] from her position on the . . . CPAB for attending the rally, for not denouncing Antifa, and for associating with people Carr identified as 'Antifa.'" *Id.* ¶ 19.

II.

Under Rule 12(b)(6), a defendant may move to dismiss for failure to state a claim upon which relief can be granted. A plaintiff must state "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has "facial plausibility" if the plaintiff pleads facts that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint in this case asserts two First Amendment claims—one for retaliation and the other for compelled speech. Neither states a claim for relief under Ninth Circuit law. *See Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010).

A.

Plaintiff alleges that Carr unlawfully removed Plaintiff from the CPAB "in retaliation for Plaintiff's attendance at the April 27 Rally and the appearance of her association with people identified as 'Antifa' at that rally." Compl. ¶ 31.

To state a claim for First Amendment retaliation under § 1983, Plaintiff must establish that "(1) [s]he engaged in constitutionally protected activity; (2) as a result, [s]he was subjected to adverse action by the defendant that would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) there was a substantial causal relationship between the constitutionally

protected activity and the adverse action." *Blair*, 608 F.3d at 543. Defendant does not dispute that Plaintiff engaged in constitutionally protected activity (attending the rally and appearing near purported Antifa members) or that Carr, a state actor, removed Plaintiff from the CPAB for reasons other than Plaintiff's appearance at the rally and subsequent failure to denounce Antifa. Opp. 4. "Were this a typical First Amendment retaliation case, [this Court] would be left to evaluate only whether [Carr's] action would chill a person of ordinary firmness from continuing to speak out." *Blair*, 608 F.3d at 543. The issue here is whether this is a typical case as defined by the Ninth Circuit in *Blair*.

In *Blair*, the plaintiff, a publicly elected member of defendant school board, was selected as the board's vice president by his fellow board members. *Blair*, 608 F.3d at 542. Those fellow board members subsequently removed him from his executive position as vice president for publicly criticizing the school's superintendent, though the plaintiff remained a board member. *Id.* at 544. The plaintiff sued the school district and others for unlawful First Amendment retaliation in violation of 42 U.S.C. § 1983. *Id.* at 543. The Ninth Circuit affirmed summary judgment in favor of the defendants, holding that the plaintiff's removal from his executive position did not violate the First Amendment right to free speech in this political context. *Id.* at 543-44. The court reasoned that the plaintiff did not present "a typical First Amendment retaliation case" because "the 'adverse action' [he] is challenging was taken by his peers in the political arena," and his peers were entitled to have "a vice president who shared their views." *Id.* The Ninth Circuit further explained that three facts distinguished *Blair* from the "the ordinary retaliation case." *Id.* at 544-45. Each is worth considering in exploring the reach of the *Blair* holding.

First, the court noted that the adverse action constituted "de minimis deprivations of benefits and privileges on account of one's speech" as contrasted with the loss of a government job by the "prototypical plaintiff" in *Pickering v. Bd. of Educ. of Township High Sch. Dist.*, 391 U.S. 563, 564 (1968)—a teacher fired for publicly criticizing the school board. *Blair*, 608 F.3d at 544. In noting this contrast, the court also observed that the removal in *Blair* occurred "[t]hrough the ordinary functioning of the democratic process . . . by the very people who elected him to the position in the first place." 608 F.3d at 544.

Relying on a footnote in *Blair*, Plaintiff attempts to distinguish that case by arguing that the adverse action there was only the "minor indignity" of losing a title (vice president) rather than his actual position on the school board (which he retained). Plaintiff argues that the outcome should be different here because she was in fact removed from the CPAB. Opp. 4-5. Plaintiff misses the point of the *Blair* footnote: the Ninth Circuit distinguished between titular loss and total

removal because the board members could remove the plaintiff from the executive position they had selected for him but could not deprive him of his seat on the board for which he was popularly elected. To this point, the Ninth Circuit stated: "This would be a different case had Blair's peers somehow managed to vote him off the Board or deprive him of authority he enjoyed by virtue of his popular election—but they didn't." 608 F.3d at 545 n.4.[2]

Nor can *Blair* be read to be limited to cases involving a loss of title. As a factual matter, the plaintiff in that case was stripped of his executive position on the board. *Blair v. Bethel Sch. Dist.*, No. C08-5181FDB, 2008 WL 4740159, at *1 (W.D. Wash. Oct. 24, 2008) (noting that the vice president was responsible for performing the duties of the president in his or her absence), *aff'd*, 608 F.3d 540 (9th Cir. 2010). As a legal matter, the Ninth Circuit has long rejected as constitutionally consequential any distinction between a minor and major loss resulting from retaliation. *See Hyland v. Wonder*, 972 F.2d 1129, 1135 (9th Cir. 1992) (finding "the opportunity to serve as a volunteer" and the loss of fully paid employment to be "equally egregious in the eyes of the Constitution"); *see also id*. (citing authority for the proposition that the government violates a person's right to free speech by imposing a fine of "a penny" for party affiliation). To read *Blair* so narrowly not only would cause it to run afoul of an established line of Ninth Circuit authority but also would create an intractable problem of judicial line drawing in determining the magnitude of any loss. A subsequent Ninth Circuit panel declined to interpret *Blair* this way. *See Chinn v. City of Spokane*, 429 F. App'x 673, 675 (9th Cir. 2011) (relying on *Blair* to reject a retaliation claim brought by a plaintiff whose appointment to a local judgeship—a position that cannot be deemed merely "titular"—was revoked because he protested a zoning change as he had a First Amendment right to do).[3]

---

[2] That the Ninth Circuit intended this more limited point is clear from the case upon which it relied in making it. *Blair*, 608 F.3d at 545 n.4 (citing *Bond v. Floyd*, 385 U.S. 116, 118 (1966). As described in *Blair*, the Georgia legislators in *Bond* refused to seat a popularly elected representative in retaliation "on the trumped-up ground he could not, in good faith, take the requisite oath of office to support the Constitution," which had the "deleterious [effect] . . . of nullifying a popular vote." *Id*. Neither *Blair* nor this case involves the overturning of the popular will.

[3] Other circuits have reached similar conclusions. *See, e.g., Rash-Aldridge v. Ramirez*, 96 F.3d 117, 118 (5th Cir. 1996) (rejecting retaliation claim brought by a political official who was removed from his appointed position as a member of a metropolitan planning organization); *Werkheiser v. Pocono Twp. Bd. of Supervisors*, 704 F. App'x 156, 157 (3d Cir. 2017) (rejecting retaliation claim

Second, *Blair* noted that the political context distinguished it from the ordinary retaliation case because "more is fair in electoral politics than in other contexts." 608 F.3d at 544. That is, political officials are expected to act politically, which includes voting against candidates who express differing views, as this is part of "the regular functioning of the political process." *Id*. at 544-45. This principle applies here. *See Chinn*, 429 F. App'x at 675 (finding that the failure to "cast on-the-record votes against [the plaintiff's] confirmation" did not take the case outside the scope of the holding in *Blair*). While Carr did not vote to remove Plaintiff from the CPAB, the regular political process did not require her to do so. Carr was politically entitled, as a prerogative of her position as a council member, to appoint the person who would best represent her views and interests. Compl. 21. To that end, "Carr had final policymaking authority on the decision to hire and fire [Plaintiff]." *Id*. Under *Blair*, Carr was permitted to consider the political ramifications not only when she decided to appoint Plaintiff but also when she later elected to remove her from the public position. *Blair*, 608 F.3d at 544-45 (noting that "the First Amendment does not succor casualties of the regular functioning of the political process"); *see also Werkheiser*, 704 F. App'x at 159 (concluding that "a job . . . gained through politics may be lost the same way").

Third, the Ninth Circuit found it "significant" in *Blair* that the First Amendment rights of the plaintiff's fellow board members also were at stake. 608 F.3d at 545. The fellow board members had voted to place the plaintiff in the executive position; and their vote, to some extent, attached them politically to the plaintiff. Those voting members had the right to "communicate[] to [the plaintiff] and to the public" their disapproval of the plaintiff's views, and the board had a legitimate interest in seeking "to distance itself" from the plaintiff's views. *Id*. The removal of the plaintiff from the position to which the disapproving board members had appointed him constituted their public expression of disapproval and disassociation.

The existence of competing First Amendment rights in the context of political appointees who serve in a public role in the political arena is a particularly weighty consideration here. Carr was solely responsible for selecting Plaintiff to the CPAB. And by accepting the appointment, Plaintiff became a publicly visible figure in the local community. Plaintiff recognized this fact and welcomed the appointment "because it presented her with an opportunity to help her fellow Huntington Beach residents, participate in local government, and gain experience and name recognition locally as a springboard to further a career in politics."

---

brought by a political official who was removed from his appointed position to oversee the municipality's infrastructure).

Compl. ¶ 11. While Plaintiff's actions as a public figure directly reflected upon her, they also could be seen as a reflection upon Carr. Carr's selection of Plaintiff to the CPAB was a political act, and, like all political acts, subject to political attack. As a publicly elected official, Carr was accountable to the public for her political decisions, including her appointments. Of course, Plaintiff had the right to speak out on issues of concern to her and to freely associate within the full boundaries of the law. But Plaintiff also had to realize that, by accepting the appointment, she was no longer the only person politically accountable for her public actions. The political act of appointment had the political consequence of linking the appointor and appointee. By the appointment process, Plaintiff could therefore be viewed as a political extension of the person who had the sole authority to appoint her.[4]

In short, when Plaintiff decided to engage in public protest, she was expressing her views and showing support for a cause in association with other like-minded individuals. In doing so, Plaintiff unquestionably was exercising her constitutional rights. However, such exercise "does not . . . immunize [her] from the political fallout" of her actions. *Blair*, 608 F.3d at 543. Contrary to the thrust of Plaintiff's lawsuit, Carr was not politically powerless to disassociate herself from Plaintiff's public actions through a process that authorized appointment and removal in Carr's sole discretion. *See Chinn*, 429 F. App'x at 675 ("To accept [the plaintiff's] argument would be to hold that the First Amendment prohibits elected officials from choosing not to confirm, or appoint, judicial officials whose speech or views they don't embrace.").[5] Although this conclusion might leave Plaintiff without a legal remedy, not all First Amendment fights—especially political ones—must occur in the courtroom.

---

[4] The principles articulated in *Blair* preclude Plaintiff from relying on authority applicable in other contexts. *See, e.g., Pickering*, 391 U.S. at 568 (applying a balancing test in the context of government retaliation against unelected public employees); *Branti v. Finkel*, 445 U.S. 507, 518 (1980) (concluding that party affiliation may be a basis for discharge only if "the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office").

[5] *Chinn* is not distinguishable, as Plaintiff suggests, because Plaintiff had served in the appointed position before being removed. Like *Blair*, *Chinn* is not about such distinctions. Instead, they focus on the extent to which the judiciary is prepared to intervene in a political dispute that implicates competing constitutional interests that arise in the course of "the regular functioning of the political process." *Blair*, 608 F.3d at 546; *Chinn*, 429 F. App'x at 675.

B.

Plaintiff's second § 1983 First Amendment claim alleges that Carr "forc[ed]" (Compl. ¶ 19) and "intentionally coerced" (*Id.* ¶ 24) Plaintiff to make a public statement about her attendance at the April 27 rally "under threat of losing her position on . . . CPAB" (*Id.* ¶ 19).

The U.S. Supreme Court has long recognized that the freedom of speech protected by the First Amendment also extends protection against compelled speech. *See Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (noting that "the right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all"). The extent of protection depends on the context. *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2372 (2018) ("This Court's precedents have applied a lower level of scrutiny to laws that compel disclosures in certain contexts.").

Plaintiff has not demonstrated that the *Blair* analysis is inapplicable to her claim of compelled speech. Carr presented Plaintiff with a choice: provide a statement denouncing Antifa or resign. From a First Amendment standpoint, the option of a compelled statement or forced resignation was no worse than no option at all (i.e., forced resignation). Or, at least, Plaintiff has not provided any reason to suggest that being presented with an option in her circumstances changes the constitutional calculus. Nor would it appear to have that effect. The principles applied in *Blair* do not seem to rest on any distinction between restricted and compelled speech. It is the context of appointing an individual to a political post for which the appointing politician is publicly accountable that makes the difference.

III.

An application of binding Ninth Circuit law to the allegations in this case requires dismissal. No amendment of the pleading can change this conclusion. Accordingly, the motion to dismiss is **GRANTED** with prejudice.